Next case of the morning is number 24-1008-4 Sherkezi v. City of Arlington and we'll hear first from Mr. Norred after you get yourselves settled. Good morning. May it please the Court. Good morning. Thank you for having us. Pick up please. Thank you. I have provided I think an eight or nine page presentation. Opposing counsel as you know has it. So I just handed it to him. I think I've made record citations on all of it. So it shouldn't be anything brand new here. And we're going to focus on the issue of the question of a property interest in a certificate of occupancy granted erroneously. So I don't understand the rule that you're asking us to announce here. Is it the rule that any time there's a certificate of occupancy obviously assuming that the document is legitimate and not somehow fabricated that that creates a property interest. Not at all Your Honor. Not not at all. The rule that I'm asking the court to get right to it is that it should be a fact intensive discussion and analysis and it should not be if it's if it's issued erroneously then the city always wins and it shouldn't be one way or the other. In all of the cases cited every single one of them whether it was a retroactive law that was found or whether it was a situation where the ordinance was there and they should have known better. In every single case courts look at all of the factors. Now it may be that they start with it's a retroactive law. And so that gives kind of a head start to the person who was operating legally within the rules and then a law is changed. But it's not dispositive nor should it be dispositive that a city issues an erroneous ordinance an erroneous certificate and then the property owner is just tough luck. We shouldn't have made that mistake. Well let's take a hypothetical that's an extreme hypothetical and I hope the answer would be easy but I'm trying to walk through what test we should announce for deciding whether there's a property interest. So you have a residential neighborhood zone residential and erroneously not through any devious graft or anything like that but erroneously someone is given a permit to operate a junkyard in the middle of the neighborhood. How do we know whether that's a property interest or not a property interest? Great question. We look at the factors that other courts have considered. We would see that the neighbors immediately erupt in objection because you're creating a nuisance. So that immediately the law was clear. Anybody looking at the situation would say that looks kind of odd. And so the person who's building and obtained the wrongfully issued certificate should have known better. There was indicia that would let him know that he was making an error. So the cases that I summarized, we'll just skip to that, I think it's page 7 of what I've given you, goes through all of the cases that are substantial mentioned by all parties. And each one of them you can see factors that were discussed and even though whether a certificate is issued erroneously or not is a very important factor. I appreciate you're walking through and you're responding to my question but I mean is it a should have known factor? Or is it that the person who issued the permit actually knew that it was erroneous? I think the should have known certainly means that the property owner loses. In every case, if the property owner knew and there's no retroactive law, he loses. So in the case of the . . . well in this case, there was no way for him to know. The previous predecessor and the predecessor before that all were there for more than a decade beforehand. No way for the property owner to know. Right. And in this case . . . The ordinance wasn't available publicly, was it? Correct. And that's been admitted by the city staff during the March 3rd hearing. So when we look at all of these together, you can't have secret laws and then invite somebody. We have a certificate given to you. The city itself doesn't know. At least the person who's issuing the COs doesn't know. So the property owners don't know. The law's not public. He does everything he's supposed to do. He spends money. He spends time. And if he hadn't gone back to get the sales issue . . . And I don't want the sales issue of cars to be a sideshow that's distracting. But it was the reason why this whole thing was found out, was discovered. So he knows I've got to go get permission from the city to sell my cars. So, what was this . . . The zoning allegedly prohibited major auto repair. Well, what did zoning in this area allow? It was a commercial area, right? It's a commercial area, but it's a PD, a planned development. So it's a subsection. So they usually, what they'll do is they'll take a zoning category and then they'll add other things to it, right? So it's a commercial area and they added these other limitations. And then it was not seen. And then the other thing that's interesting that comes up that we didn't know until late is that in 96 when they created this PD and they implemented the distinction between heavy auto repair and light auto repair, they didn't note that on the certificates of occupancy. So even the individual who ran his mechanic shop, the predecessor, immediate predecessor to Mr. Cherkesey, had heavy . . . It did not say what he had. But it did have a little note that he was doing some additional things. So that's the bottom line. It seemed to me that the trial court said, erroneous CO equals you lose. And I don't think it can be that way. Well, let's look for a minute at . . . This would be maybe an interesting question for introductory property law course. But what's the nature in your view of the property right that's conferred here? Obviously, property rights arise from state law, as we all know. So, I mean, is it a fee-simple property right? Is it transferable? I mean, does it run with the land? Or is it only for this owner or this specific use? What's the nature of this property right? How far does it extend? Obviously, if we were to decide in your favor, I don't know whether we will or not, but we're going to need to talk about what the word property right means here. I would say it's assignable as long as everything remains stable. And the reason I would say that, and that's kind of a fungible, not fungible, but quirky kind of thing to say, is that there are many cities that have an amortization process. So City of Dallas does this. For like a sexually ornate business, for example? Right. We're going to take away your ability to work, because we've made these changes in the code. And you get to come to us and say, well, I've got X number of dollars invested. Give me three more years to get my money back and make the changeover. And if they like to do that, then they do that. That's a reasonable approach for changing things slowly. If a neighborhood grew right up next to a, let's say this business. Now, this business is not too far from a neighborhood. It's on the edge of the commercial land. But nobody has complained about it for four years. There were no complaints about this, and this is in the record, until Mr. Trichese went to say, hey, I need to get this fixed. And they said no. And then suddenly he had 16 citations, and it's continued since then. But to answer your question, if things are remaining stable, the Rosenthal case seems to suggest that you could continue the operation until something changes. And I would suggest that that would mean a city council should take some action, not a hearing where everybody's confused about what exactly they're voting on, and not a, which is what I'm referring to, the March meeting. And in that meeting, all of the focus was on, look, we don't want you doing sales here. The city council was never told, look, if you turn this down for the sales and the heavy auto, then we're going to close them down for the heavy auto too. It seemed to suggest that he's going to be treated as a nonconforming use. So cities all over the land, right, have zoning rules they don't implement or they don't enforce against people who are preexisting until they make a change. And so sooner or later, they have to do something, expand, or make some kind of change. And then the city says, okay, you've got to conform now. Or they start making deals. You know, the restaurant that's been there forever says, look, if you want to do this, you've got to put an enclosure around your door. Does Texas law have any cases on those rights? We actually just passed a new law that now is statutory that says that if you tighten down the limitations, then you have to take some actions to let the property owner know. And I think that law is not even two years old. Notify the property owner to protect the property owner's rights. Right. I looked at the pictures of the place online, actually, and I was wondering, presumably it's a high-end clientele. Why didn't he bring his customers to the meeting? I assume he likes this. I mean, aside from having made a huge investment, he likes this location because it's probably convenient to customers who work around there. The first meeting in March. Now, what's not in the record before you is we've since cleaned up this, and so we're hopeful that we can get past all this. And we've had the jury trials and the citations and everything else. At the time, Mr. Schaise was working with a well-known developer. It zoomed through Planning and Zoning 9-0, and it was expected to pass. You'll note that it failed. I think it was 4-2, 3-2. There were a couple members that were missing, and things went wrong that day, let's just put it that way. That should not have gone that way. But the fact is that many of Mr. Schaise's clients ship their cars in. There's an actual picture I've got where the code enforcement's taking a picture of a Phantom Rolls-Royce in front of a dumpster while he's writing a citation. So shipping these things in from out of state. I'm sure he has some local clients. He does work for the local luxury dealers when they need something. So that would have been a good move, but it didn't happen. Pardon my ignorance. How long do these certificates of occupancy typically last? I won't give you a line, but I think they last until something changes. I could be wrong. I'm sure the city knows, but I don't. Okay, so what if a city were to, hypothetically on this case, issue a certificate of occupancy allowing use X, whatever it is, and 20 years later, for policy reasons, the jurisdiction, let's say the state, decides we're just abolishing that. Is that what you're thinking? Most cities, and I think the state of Texas now requires that property owners get notice of that, and they kind of work things out. A lot of the cities, as much as I've criticized the city. I guess what I'm trying to ask is this is sort of a mistake fact pattern. What if it was not a mistake? What if it was a deliberate policy decision to say, look, we've been allowing this use for some time. You've had plenty of time to enjoy that business, but we're changing the law. We just don't want to have this type of usage anymore. Is that a property taking? Well, I think that if you give people notice, then you have a reasonable compromise to say, look, we're changing this. Well, it could be a regulatory taking. There was a lot of law on this in the 1920s. I don't go back that far. In the city of Dallas, in many cities, and I think statewide at this point, they have to give notice, and they have to work with people, and that's going to be generally the way it works. You're just not going to say, and in my harsher moments, I would say that it's just a way for cities to take property, but the fact is that things do change, so if I want to soften a little bit and say that a city needs to be able to make rules, as long as they're being as reasonable as they can about it. You have a lot of economic development money that flows through all these cities, and I've never understood why they just don't move these people. It's good for everybody, but what do I know? Okay, well, since you're about in over time, when you come back on rebuttal, I'd like you to elaborate a little on what Judge Smith asked, is if it's a property interest, are you saying that the city is stopped from modifying the certificate at this point? So that's on rebuttal. All right. So I'm looking at this 2018 copy, and it says Arlington, the American Dream City. Yes, Your Honor. Are you taking away Mr. Jokesy's American Dream? I highly doubt it since he's still operating his major auto repair in that same location. Getting cited every other day, right? No, he was cited previous to getting a change of the zoning ordinance, but may it please the court, Joshua Skinner on behalf of the city of Arlington. Mr. Jokesy has continued all throughout this litigation, and at this point, he has received a change in the zoning from the, from the city council that allows him to operate a major auto repair at that location. Most of the citations he received do not relate to the issue of major auto repair versus minor auto repair. They relate to other code violations that the code enforcement officers discovered when they were there. It would seem to us that his problem is solved, at least in large part, but opposing counsel doesn't see it that way. Excuse me for interrupting. You could have filed a letter with the court notifying us.  But opposing counsel is, is maintaining that the, the fact that the citations still exist, they date from that interim period or from the time period before the zoning was changed maintains that that's my understanding. He's maintaining that that continues the live status of the case. Um, it's also unclear whether he's trying to challenge the issue on the used car sales or not, um, uh, at this point, but there are a couple of things I wanted to, are you stating to the court today that the city is not going to stop, uh, uh, opposing, uh, the opposing party from engaging in major auto repair? That is correct, Your Honor. Yes. Uh, Mr. Sakazy filed a new request for an amendment of the zoning. Uh, so just for, for there'll be no penalties, no, no attempt to enforce. No. Yeah. He is authorized to, he has both the zoning permission and a CEO that includes major auto repair denying that the city has tried to stop him in the past. Oh, certainly tried to, well, it's issued citations as to them operating a major auto repair. That is correct. Your Honor. Yes. When did this change of position by the city? When did this change of position? It was, I think the final city council meeting, it takes two readings because it's a legislative change.  I think the final one was in April or May. Um, Mr. Norad was at the first of those meetings. I was not, um. Okay. But you're, you're acknowledging that there was a time at which the city said, do not do major auto repair. That is correct. Your Honor. And your position, the city's position today is that that was wrong. It's major auto repair is fine. Major auto repair is fine now. It was not fine before. It never had been. Uh, community commercial, which is the zoning classification, the primary zoning calc classification for this property, never permitted any sort of auto repair. It didn't. Okay. Your point is that the city erroneously issued this certificate. I get all that. That is correct. It was an administrative official problem. The city is. As an error and made it legal. Yes. So, I mean, the, um, the CEO and that was issued to Mr. Circassian was issued an error. Um, it should not have been issued. Uh, the building official does not have the authority or the ability to change the law, which is effectively what Mr. Norred is asking, uh, for that CEO to do. Um, the law was passed by the city council in order for these laws to be passed. They go to planning and zoning commission. Uh, and then they go to the city council and the city council, the legislative body is who approves the law. Let me just ask you a question. Uh, after the, so. It's a complete surprise to me that we're here on a different set of facts than what I thought.  and let, even if the question of outstanding citations somehow keeps the case alive, you are saying that it is being litigated in state court. That is correct. Your honor as well. I, I, maybe I mentioned that too, but yes, but only as the state law claims.  Okay.      regulatory.  It would, um, but that didn't happen until after the dismissal of the claim in the district court.  So, but yeah,  we could, uh, affirm the dismissal or to decide mootness based on debilitating as to the regulatory. And so,         it's a statutory takings claim. Yes. But he also has a due process claim which was, I mean, he's got it. I mean, that's moot too. Because the due process only pertained to the March 3rd hearing. And when he's, uh, so the outcome of that, that's, there's no damages. There's nothing to resolve. No, I, I think that, um, well, I'll let Mr., I'll let opposing counsel explain why he thinks his claim is live. Um, uh, and why it's not moot in light of the, the leader change. One reason it'd be live is, uh, courts are generally suspicious when the government changes its position. Well, maybe, maybe we should. Which sounds like this case. Maybe we should have Mr. Nord get back here and explain to us why this is a live case. And then you can, you can, let's reset. Let's give him two minutes. You sit down and then you can respond to what he is actually contending instead of having to try to describe it to us.  there is one thing though that I, I'd like, if you don't mind, Your Honor, to point out before I sit down. Uh, when Mr. Nord says that the, the ordinance was not available publicly, what he means it was not on the website. Uh, that has never been the official method by which laws are promulgated. We certainly like to make things as available as possible to the public. Um, but, uh, that a plan development was not on the website is not unusual as they relate to one specific property. And so you would expect the property owner. You can see at record site one 91, you can see a map that shows that the surrounding area was all community commercial. This one piece of property is planned development. Um, it, this is that image or an image very similar to it is available on our website. We do have a map that provides that sort of information. Um, a property owner would be able to do that. Of course, in 1996, none of that would have been available. Uh, anyway, when the, when the certificates start anyway, the certificates don't start until much later. We're not arguing. We don't need to decide what we don't need to decide. The city council has amended the plan development so that if Mr. Casey will put up a fence and conduct his, his work in a particular way, then he can continue. He, he still has tickets outstanding. There were two batches of tickets. Let me finish with the defense. The fence is going to be a, a 70 to a hundred thousand dollar fence. And it's, it's a big deal. And he, and he, so it's not a matter of the city has decided we can continue, but it is true that the city has decided we continue if, so that's where that is. So what's the relief you're seeking? We're, we're seeking the relief that we want before the fence. We don't want to have to put up a hundred thousand damages.  Uh, we're looking for damages. It would be convenient if the damages were enough to put up the fence and then everybody would be happy. Your point is that they're only allowing this usage based on a, an expensive condition, right? Your theory is either enjoying that new condition or, uh, essentially recognize that that the value of that condition is itself the taking. Yes, but no. All right. So it sounds like a live dispute. We still have a live dispute.  And there are several, several citations that we won within a jury trial and the several citations that are remaining.  All right. I know we're moving well into material that's not in the record.  um, that, that does make this complicated. Um, Mr. Casey agreed to the condition of the fence, uh, at the hearing, the city council said, would you be willing to agree to that? He said, yes. Um, I'm not sure how that could ever be a source of damages, uh, in, in any sort of circumstance.  well, just to be clear, this is an expensive condition that he didn't have to deal with before under the original CEO, I assume, but I have not looked at this record. Well, the CEO would not have been better for him than not being allowed to do it at all. Is that what you mean by agree? It's better than nothing. The certificate of occupancy wouldn't have been relevant to the fence in the first place. Uh, the certificate of occupancy primarily works first building. That's just a matter of being, how you can use that building that he has on the property. That doesn't have to do with what the use of the land is for. The use of the land is all part of the zoning ordinance. That's the plan development. And that had remained consistent and consistently prohibited his kind of use. Since sometime prior to 1996.  so that. The started off as a basically community commercial property, which prohibited any sort of auto repair. And in 1996, they made an exception. The city council made an exception to permit minor auto repair. That's the only type of auto repair that was, that was permitted prior to this. Right. But I mean, it is assuming we have a live case here and I'm, you know, I'm still dumbfounded by the change in events, but anyway, the timeline here shows that there was an auto repair. Shop from 2002. It shows that they're Don's total car care. There was some sort of repair shop in 2002. Yes. That's our understanding your honor. Right. And then you have hand to hand, which has a certificate of occupancy, which Mr. Casey, and obviously the building inspector thought was valid. And then he took it over. So you really, so, um, why isn't this like the Rosenthal case? Thank you, your honor. It's not like the Rosenthal case because you have the, uh, an erroneous issuance of the CEO. This is not a situation in which the law was changed after a use already existed. A nonconforming use means the exists, the law of the, the use of the property that has now become nonconforming was not nonconforming previously. That's not a situation where you have an erroneously issued CEO, which the Texas Supreme court has addressed and has said that that does not create a property interest property interest under due process claims and undertaking claims. Generally speaking are really a matter of state law. Uh, he didn't have one here. Is that the staff case that you're referring to? Yes, your honor. Texas Supreme court.  Well, it was commission.  Yeah. Well, it's the commission on appeals. So it's an old case. Uh, but you also have the, the Swain versus university park case and the Davis versus city of Abilene case. Um, all of those were for the same proposition. But the owners knew that those were nonconforming. Knew that they were nonconforming. They were issued certificates, but they also were aware of the other,  the, the contrary zoning ordinances, if I'm not mistaken, they were once it was brought to their attention, but I believe that was after the, the permits or certificates were issued. Well, we'll have to look at, look at them more closely, but, um, in this case, you know, he had no reason to look any farther, right? Because he's getting a business. He's moving in where there was already this kind of business. CEOs are, do not, are not inheritable.   a new CEO has to be issued anytime you have a new tenant to the  So he was required to get a new CEO in order to do that. Now, again, the building official issued it improperly, um, that didn't create a takings claim, uh, for slightly different reasons. And the reason is that there's no due process violation. Now there's no due process violation. I think, I think there is no property interest there, but in addition, he was given notice and an opportunity to be heard.  uh, hypothetically, if, if, uh, let's exclude this recent development, what would the city do if it were to prevail on appeal? Supposedly he put his entire life savings, tens of thousands of dollars into upgrading, uh, the ability to make these, uh, fancy car repairs. What would the city do about that? Just say too bad you lose, move them. Well, the user cotter sales, uh, Mr. Circassians represented has already been moved. No, sir. I'm talking about the lifts and the property he put into the, uh, into the mechanical facility. That was my, unless I'm totally misunderstanding. I don't think he bought.  I don't think that was the inventory of used cars. No. So, um, I would, I don't know. We obviously did not get into discovery in the case, so I don't know what level of an allegation that he $70,000 into enhancing the lifts and adding to the, the value of the property as a repair center. Let's assume that's the case. Um, you're right. I think that the requirement on the property owner is to, uh, is to check the zoning, um, that that's the underlying law. A CEO is not a law. A CEO is an administrative letter. So yes, but I don't think that, uh, that an administrator, that the, that the administrative official has the authority to change the law here. There's no estoppel against the government. No, there's no estoppel here. And there isn't, even if it was, um, a zoning case, uh, where the zoning changes, um, there, there frequently are changes in the zoning that then become effective. Uh, that's the normal rule. That was the place. What's that? Because I understand Rosenthal was a building inspector. Let me check. So I went from an ice house, cold storage ice house to a meat processor. And in Rosenthal, I think the issue was that the, it was a nonconforming use and it was a takings claim. Uh, so you had the non, you had the use that existed prior to the law coming into effect. Um, and that would have been potentially a taking if the, uh, if it was shut down, the government could still shut it down, but it would be subject to a takings claim in that context. But it would have had to have been existence before the law came into being. If I, but the reason I'm mentioning Rosenthal is I understood that there, there was an inspector that issued a permit and that was considered enough to create a vested right. Why is the certificate of occupancy different? I think that, that Rosenthal involved a change after, uh, a change in the law, after the fact. I'm just addressing your previous statement that a certificate of occupancy cannot possibly grant a right. Do I, do I understand that's your position? Oh, no, so the, I think maybe you're referring to the Jabbery or the, um, Balby cases? No. Okay. Because I thought Rosenthal was a, a, the zoning case from way back in the twenties. 1948. Okay. It wasn't quite as far back as I thought.  But in the, in the situation involving a CEO that's been issued that then, or a permit that's been issued in which there's a desire to, to change it after the fact, you had that in, um, in Jabbery and in Balby, which were cited by opposing counsel. Uh, and in both those cases, you had discretionary permits, discretionary certificates that were issued in the context here. The issuance of the CEO is a, is a shout. Um, it's a mandatory, uh, requirement that the, the billing official does not actually have any discretion as to whether to issue the CEO. Uh, the billing official should not have issued the CEO. It violated the ordinance. But Mr., Mr. Norhead told us a few minutes ago that it matters that no one complained for four years. Is that a factor that plays into the legal analysis as to the existence of a property right or otherwise? Uh, no, no, Your Honor. Um, similarly to in the context of, of, um, land that somebody that's owned by the public, that somebody wants to adversely possess the fact that you can't do it. You can't adversely possess public land. Uh, there is not an expectation and a requirement that the, the public,  go out and seek to enforce every law to its T. Uh, certainly it, it is a, an indication that Mr. Circasi was, um, was in so far as possible. Uh, apparently a good neighbor that he wasn't bothering the, the surrounding areas. And I, and I suspect, um, that that's a good part of why the city council, uh, was apparently willing to, to change the law. Um, I, I don't think they would have been willing to do that if there had been a history of complaints involving it. That's a political issue though. It doesn't go to the legal. What kind of fence costs 70 to a hundred thousand? I couldn't tell you why it's going to cost 70 to a hundred thousand. That's the plaintiff's allegation. There, there, the discussion about the fence in the hearing is very brief. It doesn't say very much. There was nothing in the city council meeting where there was the discussion with, uh, Mr. Scazi and his representative, uh, indicating that it needed to be a particular monetary amount for the fence. Okay. Well, if you don't have nothing else to say, we . . . Unless you have any other questions. . . . about your argument. Thank you, Your Honor. All right. Thank you. Mr. . . . Dad said, always said answer the easy questions first. Mr. . . . Mr. Norah, what, what do you do with the staff case from the 1937 commission? Well, I noticed that, um, in the staff case, and I put the notes here in that, in that one slide, uh, the plaintiff was aware of the code from the get go. The neighbors complained it was a nuisance. And the reliance that the property owner had was on the promise of a future CO. So, if you looked at, if you look, if you read that case, what you'll see is he gets the promise from the authority. He starts spending money. And he has spent all of his money before he even gets a CO. So, there was no reliance on the CO itself. So, it's easy to distinguish that one. But I like, I like Swain because, like all of these that are on the slide, they, they all come to a conclusion, but they all have a fact specific evaluation. So, they'll say,  the CO is erroneous. And also, and then they go on, with this extensive dicta about why this is still a valid, moral thing for them to do. Um, the fence has to be nine feet tall. You can't see through it. It has to have moving gates on each side. It's pretty detailed. So, the, the minimum quote that he's seen so far is 70,000. So, the,  we're trying to mitigate damages. So, yes, we go ask and say, can you change the law? And one of the problems that we have here is, if the city had told the city council back during that March hearing, look, we can bifurcate this question. Let's vote on sales. And then let's vote on the heavy auto. If you just watch the video of the, of the hearing, it's pretty clear. They're okay. One of the city council member says, well, it looks like we've already given them the heavy auto. The question is all about the sales and the sales is what killed it. So, the question, oh, and then one other question that came up. I put down the 2002 opening because that's what I know about. The planned development most likely did have a car manufacturer, a car repair place there in 1996, or they wouldn't have done that in the first place. But I don't have that in the record. But let me ask you, I have to ask you again, what does the Supreme Court case of DeVillier have to say about your  if anything? I'm sorry, which case? DeVillier. It had to do with some landowners making a claim, and these other gentlemen can relate it to you better than I, if you like, making a claim because the state of Texas undertook some flood control stuff that flooded their property, just flooded it. So, they sued in federal court, and it went up to the Supreme Court, and the Supreme Court said basically they needed to go back on inverse takings. Well, they have a remedy, right? So, I think if you have a remedy, that'll get them something that they can do. Well, are you asking us to do more than state law allows? No, not at all. I think that the state, the case, the Mosley case, which we haven't talked about, does have to have some impact. And it's not from 1937, right? It's from 2019. And so, and I think here the judge was saying the right thing. You can't have reliance on a city official, and I'll just interrupt myself and say, yes, the law, you could go find it. But when all of the other laws are available online, and this special little law that says what you're doing is illegal is not online, and you've told me that what I'm doing is okay, and I rely on it, and the predecessor did it, all of these things together seem to suggest that a Rosenthal type of approach is the best way to go. It should fit under there. This is a 1983 suit against the city, not a state, right? That's correct. If I recall, De Villiers is a state court. Correct. I'll be honest, I don't know. That's fine. It was on a brief issue. It's okay. All right. Well, we. If there are no other questions, I appreciate your time, Your Honor. Okay. Thank you. I mean, this is certainly perplexing.